IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD JAMES MADERO,

                    *Plaintiff*,

    v.

OFFICER CHRISTINE LUFFEY, *et al*,

                    *Defendants*.

Civil Action No. 2:19-cv-700

Hon. William S. Stickman, IV

## OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Ronald J. Madero ("Madero"), alleges that he took care of abandoned cats in his neighborhood, giving them food, shelter and occasional medical care. He says that the cats were, in fact, his property. At some point, complaints of neighbors led Pittsburgh Police Officer Christine Luffey ("Officer Luffey") to visit Madero to assess the situation with the cats. Madero claims that Officer Luffey lied about having a warrant in order to secure his consent to search the premises, including an abandoned residence which he could access. The search was conducted by a non-officer volunteer, Mary Kay Gentert ("Gentert"). Madero alleges that Officer Luffey used information from the search to obtain a warrant, which was later executed on his property by Officer Luffey with assistance from Gentert and Tarra Provident ("Provident"), volunteers with Homeless Cat Management Team ("HCMT"). The seized cats were taken to Humane Animal Rescue ("HAR"), a non-profit shelter, where some were euthanized. None of the cats were returned to Madero.

Madero's lengthy Complaint asserts various causes of action under 42 U.S.C. §1983 and state law arising from an allegedly illegal search and wrongful seizure of the cats. Pending

before the Court are the Motions to Dismiss of Officer Luffey (ECF No. 50), the HAR Defendants (ECF No. 32), and HCMT and Provident (ECF No. 46). For the reasons set forth herein, Officer Luffey's Motion to Dismiss (ECF No. 50) is granted in part and denied in part. The HAR Defendants' Motion to Dismiss (ECF No. 32) is granted. HCMT's and Provident's Motion to Dismiss (ECF No. 46) is granted in part and denied in part.

## FACTUAL AND PROCEDURAL HISTORY

Madero is a seventy-eight-year-old man who resides at 5221 ½ Lytle Street in the Hazelwood neighborhood of Pittsburgh with his son, Mark Madero ("Mark"). Mark is the owner of the properties at 5221 ½ and 5223 Lytle Street, which form a duplex. 5223 Lytle Street is not occupied, but it is kept under lock and is accessible by Madero and Mark. Madero stores some of his personal belongings in one of the rooms of 5223. Plaintiff's Complaint (ECF No. 1) ("Compl.") ¶¶ 4, 18-19, 21.

The properties sit on a dead-end street commonly used to dump abandoned cats and kittens. Madero has attempted to help the abandoned cats by working with Animal Friends volunteers to conduct mass spay and neuters for cats in the area. He also provided private veterinary care for sick and injured cats and kittens, as well as food and winter shelter for the cats and kittens. Madero claims to have spent thousands of dollars providing veterinary care to the cats and hundreds of dollars for food and winter shelter. *Id.* at ¶¶ 24–28.

On or about May 23, 2017, a neighbor of Madero contacted Animal Care and Control ("ACC") and complained about kittens abandoned in front of her residence at 5221 Lytle Street. According to Madero, the neighbor has never visited his properties and she did not complain about cats at 5221 ½ or 5223 Lytle Street. Madero states that ACC supervisor David Madden

2

sent an email to Officer Luffey that a complaint was received about cats being kept inside 5221 ½ Lytle Street. *Id*. at ¶¶ 29-32.

On or about June 15, 2017, Officer Luffey, who was on duty and wearing her uniform, traveled with Gentert to 5221 ½ Lytle Street. *Id*. at ¶ 75-77. Gentert, who is affiliated with HCMT, previously cooperated with Officer Luffey in animal related cases. *Id*. at ¶¶ 45–74, 101-02. When the women encountered Madero, Officer Luffey identified herself and identified Gentert as a member of HCMT. *Id*. at ¶¶ 84–85. Officer Luffey informed Madero that they wanted to inspect the inside of 5223 and 5221 ½ Lytle Street. *Id*. at ¶¶ 84–85. When he refused, Madero alleges that Officer Luffey claimed to have a search warrant and said she "could bust down his door," and would "call for back up to break the door down and execute the warrant." *Id.* at ¶¶ 87-88. Madero also alleges that Officer Luffey misrepresented Gentert's presence and purpose, claiming he was led to believe that Gentert was there to help Madero with his "spay and neuter" services for the cats, and it was concealed to him that Gentert was assisting Officer Luffey with an investigation. *Id*. at ¶¶ 97, 98, 99, 103-04, 108.

Gentert went into 5223 Lytle Street with Madero while Officer Luffey waited outside. *Id*. at ¶ 112. Gentert took photographs inside. *Id*. at ¶ 114. After Gentert looked inside of 5223 Lytle Street, Officer Luffey told Madero that she and Gentert wanted to see the inside of 5221 ½ Lytle Street. *Id*. at ¶ 118. Madero allowed Gentert to enter the property while Officer Luffey waited outside. *Id*. at ¶¶ 119–20. Afterwards, Officer Luffey obtained a search warrant, which Madero asserts was the result of the information and photographs gathered by Gentert. *Id*. at ¶ 137. The warrant identified 5223 Lytle Street as the location to be searched. *Id*. at ¶ 144.

On June 29, 2017, Madero took five cats to Animal Friends for veterinary care. *Id*. at ¶ 131. He brought five additional cats to Animal Friends the next day, June 30, 2017, and

retrieved the first five cats that had surgery. *Id*. at ¶¶ 233, 235. Madero arrived home just after the arrival of Officer Luffey, and other police officers, who were executing the search warrant to seize the cats in 5223 Lytle Street. *Id*. at ¶ 147. Gentert, Provident and volunteers from the ACC were present to assist with the cats that were seized.

A total of forty-two cats were seized and transferred to HAR.[1] *Id*. at ¶ 184. During the seizure of the cats, Madero contends they "were left for hours on the hot concrete, in the direct sunlight, in 80-degree weather, with no water." *Id*. at ¶ 164. Madero further asserts that he was not permitted to assist with placing the cats in carriers, and that "Gentert, Provident, and the ACC used snare catch poles to strangle the cats and force them into carriers or traps […]." *Id*. at ¶ 168.

Once at HAR, Madero posits that the cats received no veterinary treatment for weeks and were kept in small cages in a windowless room. *Id*. at ¶¶ 201-02, 233-34, 240, 249, 256-59. Some of the cats were euthanized. *Id*. at ¶¶203-06. According to Madero, this was done without inquiring into the ownership of the cats, without notice to him, and pursuant to a forged surrender document.[2] *Id*. at ¶¶ 207-08, 212-18, 221-32, 236-38, 296-307.

On August 7, 2017, Officer Luffey filed a Criminal Complaint against Madero, accusing him of committing five counts of misdemeanor cruelty to animals and thirty-seven summary counts of cruelty to animals. *Id*. at ¶¶ 261–262. On August 3, 2018, Madero pled *nolo contendere* to twenty counts of disorderly conduct pursuant to 18 Pa.C.S.A. § 5503(a)(4) at Criminal Docket Number CP-02-CR-0012086-2017 in the Allegheny County Court of Common

---

[1] Cats were seized from 5223 Lytle Street, the porch of 5221 ½ Lytle Street, and Madero's car and those left by Madero at Animal Friends were later transferred to HAR. *Id*. at ¶¶ 149, 170, 171.

[2] Madero asserts he did not make a written or oral surrender of the cats to Luffey. *Id*. at ¶¶ 286–287. It is his position that the surrender document produced in the underlying criminal case is "fabricated evidence." *Id*. at ¶¶ 295–296

Pleas of Pennsylvania. He was sentenced to ninety days probation for each count of disorderly conduct, with all twenty sentences to run consecutively.

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also DiCarlo v. St. Marcy Hosp.*, 530 F.3d 255, 262-63 (3d Cir. 2008).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts give rise to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id*.

"[A] motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds

that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). Although the Court must accept the allegations in the Complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

## ANALYSIS

The Motions to Dismiss filed by the various Defendants raise arguments that are common to multiple Defendants. However, because each of the Defendants played a different role in the chain of events giving rise to this action, the analysis of their respective motions does not lend itself to an issue-by-issue discussion. Rather, each Defendant's Motion will be addressed individually.

### A. MADERO HAS ADEQUATELY PLED THAT THE CATS WERE HIS PROPERTY.

T.S. Eliot wrote that "the naming of cats is a difficult matter.'"[3] So is, in some circumstances, determining whether someone owns them. Each of the Defendants asserts as a threshold matter that Madero did not own the cats in question and, therefore, cannot maintain many of the statutory and common-law claims that he raises. In other words, they argue that if the cats were not Madero's property, he lacks the standing to assert a claim that they were unconstitutionally seized, or that their seizure will support any of the common law claims that he asserts.

Defendants argue that the Complaint pleads that the cats were merely strays that Madero took care of, rather than his property. Madero rejects this contention. Because a finding that Madero did not have a property interest in the cats would dispose of several of the claims at

---

[3] T.S. ELIOT, *The Naming of Cats*, *in* OLD POSSUM'S BOOK OF PRACTICAL CATS (1939).

once, the Court will address this issue first. Determining the ownership of the cats at issue is, as explained below, a "difficult matter."

The Complaint avers that "[t]he 42 cats were property of Mr. Madero." Compl. ¶¶ 490, 500. However, "conclusory or bare-bones allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Fowler*, 578 F.3d at 210. Here, the allegations of Madero's Complaint, when viewed as a whole, call into question his conclusory assertions that the cats were his property.

The Complaint asserts that many, if not all, of the cats at issue were strays that Madero cared for in various ways. It states that Madero's residence is on a dead-end street that is "frequently used by people as a dumping ground for unwanted cats and kittens, many of which are abandoned in an unhealthy condition." Compl. ¶ 24. Madero pleads that he "has done his best to help the cats and kittens abandoned in his neighborhood," "has spent thousands of dollars to provide veterinary care for sick and injured cats and kittens abandoned in his neighborhood," and "spent hundreds of dollars per month on cat food and provided winter shelter for the cats and kittens abandoned in his neighborhood." *Id.* at ¶¶ 25, 27-28. Further, while Madero lived at 5221 ½ Lytle Street, he had access to an abandoned duplex, located at 5223 Lytle Street, where he permitted several of the cats to stay. *Id.* at ¶ 28, 31. Thus, the Complaint makes clear that the cats originated as strays or abandoned cats that Madero acquired, if at all, by providing food, shelter and, occasionally, medical care to them.

Cats have been kept as pets for millennia[4] and are the second-most common pets currently kept in the United States.[5]  It may be surprising, then, that the law is unclear as to how one can obtain a property interest in a cat.[6]  The cats at issue here were not purchased, adopted or kept as house-cats.  If they were, there would be little question that they were Madero's property.  Rather, the cats in this case were, as detailed in the Complaint, abandoned in the neighborhood and lived outdoors or in an abandoned structure.  There is no specific Pennsylvania authority as to whether and to what extent such cats will be considered a person's property.  Indeed, while there have been several state and federal cases which concerned the seizure of cats and other animals, none specifically address the question of whether and by what means a stray cat can be acquired as property.

The nature of cats as pets complicates the question of ownership.  While many cats are kept inside, as house pets, many are free to roam around outdoors some or all of the time.  Indeed, "[i]t is estimated that over 30% of the approximately 73 million owned cats in the United States are allowed to freely roam outdoors."  *See* The Law and Feral Cats, 3 J. Animal L. & Ethics 7, 12 (2009).  In addition, "[s]urveys show that approximately 9-25% of households feed one or more 'stray' or 'free-roaming cats.'  These cats fall into at least one of the following categories: (1) formerly owned, but intentionally abandoned, domesticated housecats; (2) feral

---

[4]  Cats were, for example, popular pets in ancient Egypt, where many attained eternal life, or at least preservation, by being mummified along with their owners.  *See* https://carnegiemnh.org/why-were-cats-mummified-in-ancient-egypt/.

[5]  *See* https://www.worldatlas.com/articles/the-most-popular-pets-in-the-us.html.  Approximately 93.6 million cats are kept as pets in the United States.  Freshwater fish are the most common pet. Dogs come in third, at about 79.5 million.

[6]  *See* The Law and Feral Cats, 3 J. Animal L. & Ethics 7 (2009) ("Surprisingly…cats were largely absent from the common law and legislation pertaining to animals until very recently.").

cats[7]; or (3) lost cats that have wandered from homes without identification." *Id.* Madero's Complaint makes clear that some, if not all, of the cats in question were (at least at some point) strays that he provided with some degree of care. It is less clear whether Madero's care was enough to render those cats his property.

There are no Pennsylvania cases or statutes specifically addressing the acquisition of property rights in a stray cat.[8] Cats, like all animals, are considered chattel under Pennsylvania law. *Ferrell v. Trustees of the University of Pennsylvania*, 1994 WL 702869 (E.D.Pa. December 12, 1994). Because cats are not included in the definition of "domestic animal" at 1 Pa.C.S.A. §1991 they are classified as "wild animals" by the Pennsylvania Game and Wildlife Code. 34 Pa.C.S.A. §102.[9] The mobile nature of wild animals, including stray or feral cats, makes the

---

[7] A feral cat is "the unowned offspring of outdoor cats." *Id*. at 11 (citing MARGARET R. SLATER, COMMUNITY APPROACHES TO FERAL CATS (Humane Society Press, 2002)). Contrary to strays, feral cats have no experience living with humans and are completely unsocialized.

[8] While there are no Pennsylvania statutes governing the ownership of cats, the Pennsylvania dog law, 3 P.S. §459-102 et seq., provides guidance as to the ownership of dogs. The statute defines "owner" as:

> "Owner." When applied to the proprietorship of a dog, includes every person having a right of property in such dog, ***and every person who keeps or harbors such dog or has it in his care, and every person who permits such dog to remain on or about any premises occupied by him***.

3 P.S. §459-102 (emphasis added). While called the "dog law" and generally focused on requirements relating to keeping dogs, some provisions of the dog law apply to cats. Cats are included in the definitions set forth at Section 459-102 ("the genus and species known as Felis catus"). Certain requirements for spaying or neutering are also extended to cats. *See* 3 P.S. 459-902A. However, the law makes no provision for the ownership of cats and the definition cited above is, by its very terms, limited to dogs.

[9] The Game and Wildlife Code defines "wild animal" as "[a]ll mammals other than domestic animals as defined in 1 Pa.C.S. §1991 (relating to definitions). The term shall not include a species or variation of swine, pig or boar, held in captivity." 34 Pa.C.S.A.§102. "Domestic Animal" is defined as "[a]ny equine animal, bovine animal, sheep, goat and pig. Dogs are subject to the Pennsylvania Dog Law, 3 P.S. §459-101, and are, perhaps statutorily carved out of the general definition of "wild animal." No such statute applies to cats. Some older cases refer

determination of whether property rights are acquired more complex than other personal property.

From the dawn of the western legal experience, codes, cases and commentators have recognized the challenge in determining legal possession of a wild animal and have required the exercise of possession, dominion and control over such animal to constitute ownership.

The Institutes of Justinian recognized:

> Wild animals, birds and fish, that is to say all the creatures which the land, the sea, and the sky produce, as soon as they are caught by anyone become at once the property of their captor by the law of nations; for natural reason admits the title of the first occupant to that which previously had no owner…An animal thus caught by you is deemed your property so long as it is completely under your control; but so soon as it has escaped from your control, and recovered its natural liberty, it ceases to be yours, and belongs to the first person who subsequently catches it.

J. INST. 2.1.12. The Roman view espoused by the Institutes was accepted at common law and was described by Blackstone as a qualified property right—wild animals can be the subject of property rights, but only to the extent that they are within the control of their putative owner:

> A qualified property may subsist in animals *ferae naturae*, per industriam hominis: by a man's reclaiming and making them tame by art, industry and education; or by so confining them within his own immediate power, that they cannot escape and use their natural liberty…These are no longer the property of a man, than while they continue in his keeping or actual possession: but if at any time they regain their natural liberty his property instantly ceases.

2 WILLIAM BLACKSTONE, COMMENTARIES, *391-92. However, Blackstone recognized that some animals, by their nature, tend to return to their "owner" even though they are permitted to roam.

---

to dogs and other tame animals as *mansuetae naturae*, as distinct from *ferae naturae*. *See Andrews v. Smith*, 188 A. 146, 148 (Pa. 1936). These cases generally address liability for injuries caused by the animal, rather than acquisition of property rights in the same. In any event, principles of statutory construction require a finding that the limited definition of "domestic animal" renders all others wild animals. *See Seeton v. Pennsylvania Game Commission*, 937 A.2d 1028 (Pa. 2007) (discussing the scope and extent of the definitions provided by the Pennsylvania Game and Wildlife Code).

He referred to such animals as having an "*animum revertendi*[10], which is only to be known by their usual custom of returning." *Id.* at 392. For such animals:

> The law therefore extends this possession farther than the mere manual occupation; for my tame hawk that is pursuing his quarry in my presence, though he is at liberty to go where he pleases, is nevertheless my property for he hath *animum revertendi*. So are my pigeons, that are flying at a distance from their home (especially those of the carrier kind) and likewise the deer that is chased out of my park or forest, and is instantly pursued by the keeper or forester: all of which remain in my possession, and I still preserve my qualified property in them. But if they stray without my knowledge, and do not return in the usual manner, it is then lawful for any stranger to take them. But if a deer or any wild animal reclaimed, hath a collar or other mark put upon him, and goes and returns at his pleasure, or if a wild swan is taken, and marked and turned loose in the river, the owner's property in him still continues, and it is not lawful for anyone else to take him.

*Id.*

The principle that wild animals become property only to the extent that they are kept within a person's dominion and control, and that that property interest may be vitiated by the animal's return to nature was adopted by the colonies and, later, the States. For example, in the law-school staple *Pierson v. Post*, 3 Cai.R. 175, 178 (1805), the Supreme Court of New York explored and adopted the jurisprudential history governing acquiring ownership in animals. ("It is admitted that a fox is an animal *ferae naturae*, and that property in such animals is acquired by occupancy only."). The *Pierson* court explained that, to acquire ownership of a wild animal, it is necessary "to deprive them of their natural liberty and subject them to the control of their pursuer." *Id*. at 179.

Pennsylvania adopted the common-law view of animal ownership. *See Wallis v. Mease*, 3 Binn. 546 (Pa. 1811) ("Bees are *ferae naturae*. If reclaimed and domesticated as they sometimes are, they are the subject of a qualified property, that is, so long as they remain with

---

[10] "Animum revertendi" can be translated as a habit or mind for returning.

the person who hived them."); *Commonwealth v. Agway*, 232 A.2d 69, 70 (Pa Super. 1967) ("Fish running in the streams of a state or nation are *ferae naturae*. They are not subject of property until they are reduced to possession, and if alive, property in them exists only so long as possession continues."). *See also* Pennsylvania Blackstone, Ch. XXV 9 (quoting 2 WILLIAM BLACKSTONE, COMMENTARIES, above).[11]

Because they are not statutorily classified as domestic animals, cats must be considered wild animals. As such, they became the property of Madero only to the extent that he brought them within his dominion and control. This would conclusively establish that the cats which Madero found, took into his home, provided with food and care and which he considered to be his property were, in fact, his property.

For those cats which were outside of Madero's home, either in the unoccupied side of the duplex or wandering around his property, the analysis is more difficult. The Court holds that the determination of property rights in stray (or, perhaps, formerly stray) cats eludes a bright line definition, but must be determined on a case-by-case basis. Outdoor cats may, in many circumstances, be considered animals with an *animum revertendi*. Indeed, as explained above, it

---

[11] By an interesting extension of common law reasoning, Pennsylvania Courts have deemed oil and gas to be in the nature of *ferae naturae*, justifying the law of capture. As this Court once observed:

> Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals ferae naturae. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract is uncertain,' as said by Chief Justice Agnew in *Brown v. Vandergrift*, 80 Pa. 147, 148. They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone.

*White v. New York State Natural Gas Corp.,* 190 F.Supp. 342, 346 (W.D.Pa. 1960) (citing *Brown v. Vandergrift*, 80 Pa. 142, 148 (Pa. 1875)).

is not uncommon for cats which are considered pets by their owners to be permitted to wander outdoors. Provided that they have a habit of returning to their "home" and their owner considers them to remain his property during their forays into the wild, and the owner acts toward them in a manner which is consistent with ownership, the common law will recognize ongoing property rights in the animal.[12] The application of ancient common law principals will permit a person to claim ownership in a "outside cat" notwithstanding the cat's propensity to wander away from the immediate dominion and control of its owner. In determining whether such cats are the property of a putative owner, a court should consider, *inter alia,* whether the cat is considered to be a pet or owned by the putative owner; whether the cat has been given a name; whether the cat wears a collar and/or tag; the nature, regularity and duration of the relationship; whether the cat is permitted inside the putative owner's residence; whether the owner feeds the cat; and whether the owner provides veterinary care to the cat, and whether the cat exhibits a familiar mannerism

---

[12] The Court notes the opinion of a commentator on animal law who proposes a sliding scale analysis for determining whether a person has acquired possession of a cat:

> Under this regime, if a keeper or caretaker has given a feral cat food and water every day for several years and has provided the animal with periodic veterinary care, that person is more likely to be viewed as an owner—and subject to liability-than a person who has merely fed a feral cat once a day for six months. This type of sliding scale would enable courts to hold feral cat keepers and caretakers responsible when their actions reflect a relatively high degree of ownership. Simultaneously, this system would allow the casual good Samaritan to feed a feral cat without fear of liability. This rule would effectively advance two competing policy goals: (1) encouraging people to care for feral cats; and (2) holding caretakers more responsible when their actions begin to look more like those of an owner than those of a caretaker.

David Fry, *Detailed Discussion of Feral Cat Legal Issues*, MICHIGAN STATE UNIVERSITY ANIMAL LEGAL AND HISTORICAL CENTER (2010), https://www.animallaw.info/article/detailed-discussion-feral-cat-legal-issues. The Court believes that this sliding scale is consistent with the common law governing wild animals with an *animum revertendi,* like cats. The key considerations are the habits over time of both the owner and the cat.

with the putative owner.  No single factor is dispositive, but rather, the relationship should be viewed as an organic whole.[13]

Madero pled that the cats at issue were abandoned or stray.  However, he also pled that they were his property.  To support this, he pled that he provided them with food, shelter and occasional veterinary care.  Whether he can, ultimately, prove that he owned the cats, Madero has pled sufficient facts to support ownership of the cats to afford him the standing to maintain his claims under Section 1983 and the common law.[14]

**B.    OFFICER LUFFEY'S MOTION TO DISMISS IS GRANTED IN PART AND DENIED IN PART.**

Officer Luffey is named in all fourteen counts of the Complaint.  Some assert claims pursuant to 18 U.S.C. §1983.  Other counts assert state law tort claims. The Section 1983 claims against Officer Luffey will be permitted to proceed, as will some of the state law tort claims.

---

[13]  Deuteronomy, from Andrew Lloyd Webber's musical *Cats*, aptly summarizes some of the factors that should be considered:

> Before a cat will condescend
> To treat you as a trusted friend
> Some little token of esteem is needed, like a dish of cream
> And you might now and then supply
> Some caviar and Strasbourg pie
> Some potted grouse or salmon paste
> He's sure to have his personal taste
> And so in time you reach your aim
> And call him by his name.

[14]  Multiple Defendants cite to the City's ordinance limiting residents to five cats to argue that Madero had property rights in only five of the cats.  This is not the case.  The ordinance can, of course, limit the number of pets that a resident may lawfully keep in his or her residence, but it cannot vitiate the property rights of the owner in supernumerary animals.  *See e.g., Koorn v. Lacey Tp.*, 78 Fed.Appx. 199, 207 (3d. Cir. 2003) ("The Ordinance limits the number of dogs that the Koorns can keep at any one dwelling.  It does not foreclose them from owning any number of dogs or from owning any particular dwelling.").

### 1. Madero has pled plausible Section 1983 claims against Officer Luffey.

"Section 1983 provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. §1983). To obtain relief under §1983, a plaintiff must make a two-prong showing: (1) that s/he suffered a violation of a right secured by the Constitution and laws of the United States; and, (2) that the alleged deprivation was committed by a person acting under the color of state law. *See Karns v. Shanahan*, 879 F.3d 504, 520 (3d Cir. 2018) (citations omitted). Madero asserts that Officer Luffey violated his rights under the Fourth and Fourteenth Amendments in various ways. First, he claims that the encounter on June 15, 2017 violated the Fourth Amendment (Count I). Counts II and III assert that the June 30, 2017 execution of the warrant also violated the Fourth Amendment. Counts IV-VI allege that the June 30, 2017 seizure, slaughter and disposal of the cats deprived Madero of his property without due process of law.[15] Finally, Counts X and XIII, assert that Officer Luffey conspired with Gentert to deprive Madero of his constitutional rights in both encounters. There is no question that Officer Luffey was a state actor who was purporting to act under the color of state law in both the June encounters. Having reviewed the allegations of the Complaint, as the Court must, in a light most favorable to Madero, the Court holds that Madero has pled plausible claims against Officer Luffey under Section 1983 on all counts.

---

[15] "'[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

### a) The June 15, 2017 encounter

The Complaint pleads that on June 15, 2017, Officer Luffey engaged in a warrantless search of Madero's property (both 5223 and 5221 ½ Lytle Street) by lying about having a warrant, securing consent by threatening to "bust his door down" if he did not voluntarily permit a search and, then, using Gentert—a non-police officer—to actually search the premises. Madero asserts that Officer Luffey engaged in this conduct despite his request to have an opportunity to consult with an attorney.

The Fourth Amendment prohibits warrantless searches. It is well established that a "voluntary" search where consent "has been given only after the official conducting the search has asserted that he possesses a warrant" is not constitutionally sound. *Bumper v. State of North Carolina*, 391 U.S. 543, 549 (1968). Indeed, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion, there can be no consent." *Id.* at 550.

The Complaint clearly and unequivocally pleads a situation of "consent" by coercion. If true, the search is constitutionally suspect. Officer Luffey cannot use an intermediary to engage in conduct that she, herself, is barred from doing. The Complaint pleads that Officer Luffey identified Gentert as her "helper." It further alleges that Gentert was only admitted inside Madero's property after Officer Luffey's alleged threats. Thus, Count I sets forth a plausible claim that Officer Luffey violated Madero's rights under the Fourth Amendment.

### b) The June 30, 2017 encounter

Counts II and III allege that Officer Luffey violated Madero's rights under the Fourth Amendment with respect to the encounter on June 30, 2017, where she executed a warrant on

Madero's property, searched the premises and seized the cats. Counts II claims that the warrant obtained by Officer Luffey (based on information obtained during the June 15, 2017 encounter) was legally inoperable and, therefore, the entire search and seizure was warrantless and illegal. Count III argues that, presuming an effective warrant, the June 30, 2017 search and seizure exceeded its scope.

The analysis of Count II is more complex than that of Count I because Officer Luffey successfully obtained a search warrant from a Pennsylvania magisterial district judge that she purported to execute on June 30, 2017. Officer Luffey contends that this warrant was supported by probable cause based on information received from multiple sources and was, therefore, valid. Madero counters that the warrant was based on information from the allegedly illegal June 15, 2017 search and lacked any independent support, rendering it invalid and the June 30, 2017 search and seizure of the cats unconstitutional.

It is long-established that evidence and testimony concerning knowledge acquired during an unlawful search may not be introduced as evidence. *Murray v. U.S.*, 487 U.S. 533, 536 (1988) (citation omitted). Applied to this case, to the extent that Officer Luffey engaged in an illegal search on June 15, 2017, no information or evidence gleaned from that search can support the issuance of a valid warrant. Rather, it must be excluded as "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Nardone v. United States*, 308 U.S. 338 (1939)). However, the warrant can be saved if it can be demonstrated that it was based on a showing of probable cause independent of the initial illegal entry. This is known as the "independent source" rule. *Murray*, 487 U.S. at 537. Justice Scalia explained: "where an unlawful entry has given investigators knowledge of facts $x$ and $y$, but not fact $z$, fact $z$ can be said to be admissible because derived from an 'independent source'." *Id.* at 538. The

determination of whether a warrant is based on an independent source, as opposed to evidence garnered in an illegal search, is one of fact. *Id.* at 543-44.

Here, Officer Luffey alleges that she had independent sources of information sufficient to establish the probable cause needed to support the warrant, separate and apart from information obtained through the June 15, 2017 search. Madero strongly objects to this contention. The Court cannot make a determination at this time. As such, Officer Luffey's Motion to Dismiss Count II will be denied.[16]

### c) The June 30, 2017 seizure and disposal of the cats

Counts IV through VII assert that Officer Luffey violated Madero's Fourteenth Amendment rights by seizing and disposing of the cats without due process of law.[17] More specifically, Madero alleges that the cats were seized from him without a warrant and were then disposed of (either by euthanasia or adoption) without due process of law. Officer Luffey raises several defenses, including that the cats were not owned by Madero, that the cats were seized under a lawful warrant, that Madero surrendered any possessory interest in the cats, and/or never sought their return. Factual issues abound as to these counts. Specifically, as explained above, there are factual questions as to whether Madero owned the cats and/or whether they were seized pursuant to a valid warrant. Further, whether Officer Luffey and/or Gentert forged the surrender

---

[16] The Motion to Dismiss Count III will also be denied. It alleges—ostensibly in the alternative—that Officer Luffey exceeded the scope of the warrant. If the facts ultimately show that the warrant was, as a whole, invalid, then the scope of the warrant is irrelevant.

[17] Generally, "[t]he right to prior notice and a hearing is central to the Constitution's command of due process," as it "ensure[s] abstract fair play to the individual" and "minimize[s] unfair or mistaken deprivations." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972)). Due process is "flexible and calls for such procedural protections as the particular situation demands." *Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

document will also require a probing factual examination. For these reasons, Officer Luffey's Motion to Dismiss Counts IV through VII will be denied.

### d) Madero has pled plausible claims for conspiracy.

Although the Complaint does not specifically invoke Section 1983 in Counts X and XIII asserting claims for conspiracy, an examination of those counts demonstrates that they claim a conspiracy between Officer Luffey and others to violate Madero's constitutional rights in relation to the alleged illegal search on June 15, 2017 and the deprivation of his property rights in the cats through the allegedly forged surrender documents. These conspiracy claims are predicated on the alleged deprivation of Madero's constitutional rights as asserted at Counts I through VI. The Court will view them as claims of conspiracy under Section 1983, rather than common law conspiracy claims.

"To demonstrate a conspiracy under §1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d. Cir. 1993) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)), *abrogated on other grounds*. Moreover, a state actor may, under Section 1983, engage in a conspiracy with a private individual to deprive a person of his civil rights. *Adickes*, 398 U.S. at 150-52. To support such a claim, a plaintiff must plead (1) the period of the conspiracy; (2) the object of the conspiracy; and (3) certain actions of the alleged conspirators taken to achieve the object. *Rose v. Bartle,* 871 F.2d 331, 366 (3d. Cir. 1996).

Counts X and XIII adequately plead claims for conspiracy against Officer Luffey. They allege the time period in which Officer Luffey allegedly conspired with Gentert, the purpose of the conspiracy—*i.e.*, to undertake an unlawful search of Madero's premises and, later, a seizure

of his cats—and actions taken by Officer Luffey and Gentert to achieve those ends. As such, Officer Luffey's Motion to Dismiss with respect to the conspiracy counts, X and XIII, will be denied.

### e) Officer Luffey is not shielded by qualified immunity.

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In examining a claim for qualified immunity, district courts may employ the test enunciated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001). *See also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (The *Saucier* test is "often appropriate," but "should not be regarded as mandatory."). Under the *Saucier* analysis, a court must first determine whether the plaintiff has alleged the violation of a constitutional right. *Pearson*, 555 U.S. at 232. If the plaintiff satisfied the first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

Here, there is no question that Madero's Complaint asserts claims that Officer Luffey (and the other Defendants) violated his rights under the Fourth and Fourteenth Amendments. There is, in addition, no doubt that those rights were clearly established at the time of the conduct. Indeed, Madero pleads that Officer Luffey knowingly violated his constitutional rights by, *inter alia*, lying about having a warrant, obtaining "consent" to search through threats and, thereafter, knowingly using unconstitutionally garnered information to obtain a warrant. Qualified immunity will not provide a shield in light of the conduct plausibly alleged by Madero.

### 2. Officer Luffey's Motion to Dismiss Madero's State law claims will be granted in part and denied in part.

Madero has asserted a laundry-list of state law tort claims against Officer Luffey: Fraud (Count VII); Negligent Misrepresentation (Count VIII); Concerted Tortious Conduct relating to the June 15, 2017 encounter (Count IX); Conversion (Count XI); Trespass to Chattel (Count XII); and Concerted Tortious Conduct relating to the June 30, 2017 encounter (Count XIV). Officer Luffey has moved to dismiss all of the claims, citing immunity under the Pennsylvania Political Subdivision Tort Claims Act (PPSTCA), 42 Pa.C.S.A. §8541. The Court rejects Officer Luffey's claims for immunity and will examine whether the Complaint has asserted plausible state law tort claims against her.

Officer Luffey contends that she is immune from all the state law claims under the PPSTCA, even though the Complaint mostly pleads intentional torts against her. She contends that "Courts have held that a municipality, and thus a municipal employee, acting within the scope of her employment, cannot be held liable for intentional torts like those alleged in [the various counts of the Complaint]." *See* Brief in Support of Defendant Officer Christine Luffey's Motion to Dismiss ("Officer Luffey Br.") (ECF No. 49) p. 12. Officer Luffey cites to the Third Circuit's decision in *Sanford v. Stiles*, 456 F.3d 298, 315 (3d. Cir. 2006), for the proposition that "when there are no allegations of actual malice, an employee is protected by the PPSTCA when claims are synonymous with an intentional tort." Officer Luffey Br., p. 12. But the Court in *Sanford* held *exactly* the opposite. It explained that "[e]mployees are not immune from liability under §8545 where their conduct amounts to "actual malice" or "willful misconduct." *Sanford*, 456 F.3d at 315. "Willful misconduct has been defined by the Pennsylvania Supreme Court as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such a desire can be implied." ***Otherwise stated,***

**the term "willful misconduct" is synonymous with the term "intentional tort**."" *Id.* (citing *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994)) (emphasis added). Thus, Officer Luffey is not shielded from liability for intentional torts by the PPSTCA.

> *a) Immunity precludes Madero's negligent misrepresentation claim against Officer Luffey.*

Only Count VII, asserting negligent misrepresentation, is covered by the immunities conferred by PPSTCA. There is no question that Officer Luffey was acting in the course of her official duties at all times relative to the allegations set forth in the Complaint. The negligent misrepresentation claim does not implicate any of the exceptions to municipal liability set forth by 42 Pa.C.S.A. §8542.[18] As such, Officer Luffey is immune from liability arising from an alleged negligent misrepresentation. Count VII will be dismissed as to Officer Luffey.

> *b) Madero's claims for concerted tortious conduct fail for lack of an underlying tort.*

Officer Luffey limited her argument on Madero's common law claims to the issue of immunity under the PPSTCA. As a general matter, the Court will not raise arguments that were not asserted by the parties. However, in this case the failure to so would permit a claim to continue that is fundamentally untenable in the context of this litigation. This would run contrary to efficient and cost-effective process envisioned by the Federal Rules of Civil Procedure. *See e.g.* Fed. R. Civ. P. 1. As such, the Court *sua sponte*, and in the context of the other Defendants' Motions to Dismiss, examined whether Madero pled a tenable claim for concerted tortious conduct. The Court holds that he did not.

---

[18] Madero argues that this case, including Count VII, fall into the exception for "care, custody or control of animals." 42 Pa.C.S.A. §8542 (b)(8). To the contrary, this exception will permit liability on the part of the municipality to third parties *caused by animals* in the possession or control of a local agency, "including but not limited to police dogs and horses."

Count IX raises a claim for concerted tortious conduct against Officer Luffey, Gentert and HCMT for their alleged role in the June 15, 2017 search. Likewise Count XIV asserts a claim for concerted tortious action against Officer Luffey, Gentert and HCMT relating to the allegedly forged surrender document. A probing examination of these claims requires their dismissal.

Pennsylvania Courts have adopted the definition of concerted tortious conduct as set forth in Section 876 of the Restatement (Second) of Torts. *Hranec Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Cmwlth. 2014). The Restatement provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the others' conduct constitutes a breach of duty and gives substantial assistance or encouragement so as to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Hranec*, 107 A3d at 120 (quoting Restatement (Second) of Torts, §876). The Restatement requires both an intent to act and an act. *Larsen v. Philadelphia Newspapers*, 602 A.2d 324 (Pa. Super. 1991), *appeal denied*, 641 A.2d 587 (Pa. 1994).

Madero has failed to plead a tenable claim of tortious conduct. Concerted tortious conduct requires an underlying tort. *Miller v. County of Centre*, 702 Fed.Appx. 69, 75 (3d. Cir. 2017). Here, Madero alleges that Officer Luffey engaged in concerted tortious conduct with Gentert and, through *respondeat superior,* HCMT in two discrete respects: 1) in the encounter with Madero on June 15, 2017; and 2) in relation to the alleged forgery of the surrender documents. But, as explained above, both of these claims are inextricably intertwined with

Madero's Section 1983 claims, not state law torts. As such, they form the basis of Madero's well-pled conspiracy claims. But as explained below, none of Madero's common-law tort claims survive as to any Defendant but Officer Luffey. It is axiomatic that concerted tortious conduct requires action in concert with another tortfeasor. Here, because all of the common law tort claims against all of the other Defendants will be dismissed, Madero cannot support a claim for concerted tortious conduct. Counts IX and XIV will be dismissed.

To conclude the analysis of Officer Luffey's Motion to Dismiss, the Court will grant her Motion to Dismiss only as to Counts VII (negligent misrepresentation), IX (concerted tortious conduct), and XIV (concerted tortious conduct). Her Motion to Dismiss is denied in all other respects and, as such, all other claims against Officer Luffey may proceed.

### C.    ALL CLAIMS AGAINST THE HAR DEFENDANTS—COUNTS V, VI, VII, VIII, XI, AND XII ARE DISMISSED WITH PREJUDICE.

Madero has asserted several claims against the HAR Defendants—HAR, Jamie Wilson, Sara Anderson, Donna Hughes, Jessica Serbin, Hala Neumah, Devon Klingensmith and Sarah Shively. These Defendants were not present for either encounter between Madero and Officer Luffey. They did not participate in the execution of the search warrant or the seizure of the cats. They merely received the cats after the execution of the warrant.

The pertinent facts alleged by Madero as to the HAR Defendants are that forty-two cats were taken to HAR's shelter by Pittsburgh ACC officers after they were seized pursuant to the execution of a search warrant on June 30, 2017. Compl. ¶ 177. Broadly stated, Madero's allegations against the HAR Defendants relate to what occurred after they received the cats – *i.e.*, the care, treatment, adoption and/or euthanizing of the cats. Madero alleges twelve of the forty-two cats were euthanized. *Id.* at ¶ 240. For the following reasons the Court hereby dismisses

with prejudice all of Madero's claims against the HAR Defendants – Counts V, VI, VII, VIII, XI, and XII.[19]

### 1. Madero's claims under 42 U.S.C. § 1983 – Counts V and VI - are dismissed with prejudice.

Madero has alleged that (a) he was unconstitutionally divested of his property interest in the cats by the HAR Defendants, and (b) the HAR Defendants were "acting under the color of law" when they did so. More specifically, in Count V, Madero alleges a Fourteenth Amendment violation by the HAR Defendants for the "slaughter of cats/failure to provide care," and in Count VI, he alleges a Fourteenth Amendment violation for "disposal of cats." Madero seeks to hold the HAR Defendants liable on the theory that they were performing a municipal function on behalf of the City of Pittsburgh. Compl. ¶¶ 186-190. The Court finds that the HAR Defendants were not acting under the color of law with regard to the allegations against them, precluding Madero's §1983 claims against them.

A private entity is ordinarily not a proper "person" for purposes of an action alleged under 42 U.S.C. § 1983. For Madero's claims to survive the motion to dismiss, he must allege that the HAR Defendants acted under the color of state law when they cared for, treated, fostered adoption and/or euthanized the cats.

"Although a private person may cause a deprivation of [a constitutional] right, he may be subjected to liability under §1983 only when he does so under color of law." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978). The inquiry into whether a private individual or association was acting under color of law is fact specific, and the plaintiff has the burden of establishing

---

[19] Madero has conceded that the HAR Defendants were incorrectly named in the caption for Counts VII and VII. *See* Plaintiff's Brief in Opposition to HAR Defendants' Motion to Dismiss ("Pl. Br. in Opp'n to HAR") (ECF No. 45), p. 5. Therefore, no further discussion or analysis is warranted, and the Court dismisses Counts VII and VII against the HAR Defendants with prejudice.

color of law. *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (citations omitted). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001), the Supreme Court held that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." To conduct this analysis, the Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists," which are as follows:

> (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (citation omitted). These tests are commonly referred to as (1) the public function test, (2) the close nexus test, and (3) the symbiotic relationship test. Another test, commonly referred to as the "joint action test," asks whether a private entity was a willful participant in joint action with the state or its agents." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982). In deciding whether state action has occurred, the central purpose of the inquiry is to "assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which plaintiff complains." *Brentwood*, 531 U.S. at 295 (citation omitted) (emphasis in original). "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *American Mfs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

Here, Madero has done nothing more than allege in a conclusory fashion that the HAR Defendants were acting under the color of state law. He has not asserted that the actions of the HAR Defendants in running a non-profit animal welfare organization constitute state action. Madero has not pled that the HAR Defendants acted under color of state law according to any of the aforementioned tests. In other words, Madero has failed to plead a threshold color of state law claim against the HAR Defendants.

As to the public function test, Madero has not pled that the HAR's Defendants actions in caring for, treating, fostering adoption and/or euthanizing the cats was a function that was traditionally the exclusive prerogative of the City. The Court has no basis for concluding that the services offered by the HAR Defendants were ever the exclusive prerogative of the state. Moreover, no allegations exist that HAR or that any of its board or individual members were intertwined with the City. As to the close nexus test, Madero has not pled circumstances that support a close nexus between the City and the HAR Defendants' actions of caring for, treating, fostering adoption and/or euthanizing the cats. There are no allegations that the City participated in anything that occurred to the cats after the HAR Defendants received them. Madero does not aver any facts to support a conclusion that the HAR Defendants' conduct in treating animals it received was dictated or controlled by the City. "That a private entity performs a function which serves the public does not make its acts state action." *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982).

As to the symbiotic relationship test, Madero has not alleged facts that support a finding that a symbiotic relationship existed between the City and Defendants. This theory is seemingly inapplicable to this case as there is no close association of mutual benefit between the City and the HAR Defendants. There is no indication that HAR, a non-profit organization, made any

profit from receiving the cats, and there are no facts pled that the City received any sort of tangible benefit from the HAR Defendants, save possibly the decrease in abandoned animals and the roaming feral cat population.

Lastly, as to the joint action test, it involves an inquiry into whether (1) the private entity has a "prearranged plan" with the police officers, and (2) whether under the plan, the police officers will "substitute their [own] judgment" with that of the private entity's. *Cruz v. Donnelly*, 727 F.2d 79, 81-82 (3d Cir. 1984). This test is inapplicable here as the HAR Defendants had no prearranged plan with the City regarding seizure or treatment of the cats. Madero has pled nothing to satisfy the second prong. No facts alleged by Madero plausibly support an inference that the HAR Defendants told law enforcement personnel to take a specific course of action and that law enforcement personnel blindly obeyed. As pled, none of the allegations in the Complaint set forth facts that plausibly suggest any sort of consultation or exchange between the officers and the HAR Defendants' obtaining possession of the cats, let alone that the HAR Defendants directed the officers how to proceed during the execution of the search warrant (for which they were not present) and that the officers acted on their command.

The case of *Chambers v. Doe*, 453 F.Supp.2d 858 (D.Del. 2006), is persuasive to this Court in rendering its decision. In *Chambers*, the Delaware Society for the Prevention and Cruelty to Animals ("SPCA") and its employees were not involved in the action of the Wilmington Police Department that led to a dog being killed. The Court found that the "S.P.C.A. and its employees are private individuals engaged in the prevention of cruelty to animals under the umbrella of a private non-profit organization. They are not 'clothed with the authority of state law.'" *Id*. at 872 (citations omitted). S.P.C.A responded to a police scene to remove a dead dog that was shot by the police. *Id*. at 864. The S.P.C.A. officer and a Sergeant

from the police force examined the body of the pit bull to determine the location of the wounds. *Id.* The S.P.C.A. officer removed and stored the body of the dog and eventually cremated the dog per its policies. *Id.*

Similar to the S.P.C.A. officer in *Chambers*, HAR is a private organization engaged in sheltering and providing medical attention to neglected and injured animals under the umbrella of a private non-profit organization. There can be no argument that it was "clothed with any state authority." *See Chambers*, 453 F. Supp. 2d at 872. *See also Reichley v. Pennsylvania Dep't of Agric.*, 427 F.3d 236, 244-45 (3d Cir. 2005) (holding no cause of action under Section 1983 without defendant acting under color of official authority). Just because the HAR Defendants had an agreement with the City to accept cats seized by its ACC officers, does not mean the HAR Defendants were acting under the color of state law after HAR received the cats. The Court rejects Madero's conclusory allegation that HAR is "an evidence retention facility." Furthermore, the HAR Defendants were not required to determine if the seizure of the cats they received was lawful. While Madero contends that the surrender form was fraudulent (*see* Compl. ¶¶ 295-312), he has pled no facts imputing that knowledge to the HAR Defendants. None of the HAR Defendants had a role in creating or generating the surrender form. Significantly, Madero has not pled that the cats were licensed, that he contacted the HAR Defendants, or that he in any way attempted to redeem or claim the cats.

For these reasons, the HAR Defendants were not acting under the color of state law. Since there can be no violation of constitutional rights without state action, Counts V and VI against the HAR Defendants are dismissed with prejudice.

## 2. Madero cannot maintain his common law tort claims against the HAR Defendants.

Madero also asserts claims for conversion (Count XI) and trespass to chattel (Count XII) against the HAR Defendants. Neither of these claims can stand.

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964). Trespass to chattel consists of dispossessing another of a chattel or using or intermeddling with a chattel in the possession of another. *Pestco v. Associated Products, Inc.*, 880 A.2d 700, 708 (Pa. Super. 2005). The two torts are related and largely coterminous, but "conversion entails a more serious deprivation of the owner's rights such that an award of the full value of the property is appropriate." *Rosemont Taxicab Co. v. Philadelphia Parking Authority*, 327 F.Supp.3d 803, 828-29 (E.D.Pa. 2018). It can be said that every conversion includes a trespass to chattels, but not every trespass amounts to a conversion.

The HAR Defendants argue that this claim must fail because Madero did not own the cats. Further, they claim that Madero surrendered the cats, never sought their return, and was barred from having so many cats by the Pittsburgh ordinance. As explained above, these arguments do not warrant dismissal at this time because the question of Madero's ownership requires factual development. Rather, the conversion and trespass counts fail for a different reason, the HAR Defendants were justified in receiving the cats under the circumstances of this case.

One of the express elements of the tort of conversion is the interference in possession be "without lawful justification." Conversion and trespass to chattels are so closely related that Pennsylvania caselaw almost always addresses them together. This is reasonable because the

difference is not in the nature of the conduct, but rather, only in its duration and extent.  The requirement that interference with possession occur "without lawful justification" can reasonably be said to apply to both torts.

The Restatement (Second) of Torts recognize several defenses to both conversion and trespass to chattels. Section 265 provides:

> One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.

Restatement (Second) of Torts, §265 (Am. L. Inst. 1965). Further, Section 266 states:

> One is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order which is valid or fair on its face.

Restatement (Second) of Torts, §266 (Am. L. Inst. 1965).[20]  These provisions are applicable in this case.

When the HAR Defendants received the cats from Officer Luffey pursuant to the execution of a warrant issued by a judicial officer of the Commonwealth of Pennsylvania, they were justified to receive them and treat them in a manner consistent with their regular policies and procedures.   Animal shelters, like HAR, provide a valuable service by accepting animals that are seized by public officials and providing them with care, unfortunately including euthanasia in certain circumstances.   They do not have to make an independent inquiry to authorities as to the circumstances surrounding the animals' seizure and certainly do not have to second guess a warrant or other order of court.

---

[20]   Although neither of these sections has been expressly adopted by the Pennsylvania Supreme Court, they are consistent with the law of the Commonwealth.  As such, the Court believes that if asked, the Pennsylvania Supreme Court would adopt and apply them as representative of Pennsylvania law.

This holding is consistent with other cases which have addressed common law conversion and trespass claims against animal shelters for their actions relating to seized animals. In *Bakay v. Yarnes*, 431 F.Supp.2d 1103, 1111 (W.D.Wash. 2006), the court dismissed conversion and trespass claims against a humane society and its agent, explaining that "the cats in question were lawfully seized under a valid search warrant." As such, the defendants could not be liable in tort. Likewise, in *Campbell v. Chappelow*, 95 F.3d 576 (7th Cir. 1996), the Court cursorily affirmed the dismissal of a conversion claim where cattle was seized pursuant to a warrant. Finally, in *Bamont v. Pennsylvania Society for the Prevention of Cruelty to Animals et al*, 163 F.Supp.3d 138, 155 (E.D.Pa. 2016), the court took as a given the fact that a humane society could not be liable for conversion for accepting seized cats, but rather, could only incur such liability to the extent that it failed to comply with a subsequent court order mandating their return. It stated "[t]he PSPCA argues the individual Defendants obtained the cats with lawful justification under a valid search warrant and thus, no conversion claim can stand. ***True enough***. However, when the court ordered return of two cats on April 10, 2014, the PSPCA no longer had lawful justification to retain control over the two cats." *Id*. (emphasis added).

There is no question that the HAR Defendants received the cats in question pursuant to search and seizure warrant. They were entitled to rely on that warrant. Moreover, they never received any order, directive or other request requiring them to relinquish custody of the cats to Madero. The HAR Defendants cannot be liable for either conversion or trespass to chattels. Counts XI and XII, as asserted against them, will be dismissed.

### D. ALL OF MADERO'S CLAIMS AGAINST PROVIDENT ARE DISMISSED WITH PREJUDICE. HIS CONSPIRACY CLAIMS MAY PROCEED AGAINST HCMT[21].

HCMT is a nonprofit organization dedicated to the collection, treatment, and adoption of homeless and abandoned cats. Compl. ¶ 6. Provident is a current volunteer and former board member of HCMT. *Id.* at ¶ 8. The pertinent facts alleged by Madero are that Provident participated in the June 30, 2017, execution of the search warrant resulting in the seizure of the forty-two cats. *Id.* at ¶¶ 143, 149, 154, 170, 171. Madero alleges that HCMT volunteers, including Gentert and Provident, assisted Officer Luffey in the execution of other search warrants. *Id.* at ¶¶ 50-51, 61, 153, 160, 168. Madero does not allege that HCMT or Provident had any other contact with him or the cats after they were relinquished to HAR.

Madero brings eleven claims – Counts I, II, III, IV, V, IX, X, XI, XII, XIII, and XIV against HCMT and six claims – Counts II, III, IV, V, XI, and XII - against Provident. For the following reasons, the Court hereby dismisses with prejudice all of Madero's claims against Provident. His claims for conspiracy (Counts X and XIII) may proceed against HCMT due to Gentert's alleged conduct through the doctrine of *respondeat superior*.

### 1. Madero's claims under 42 U.S.C. §1983 – Counts I, II, III, IV and V – against HCMT and Provident are dismissed with prejudice.

Madero has alleged that (a) his Fourth and Fourteenth Amendment rights were violated when the "Execution Team" executed the illegally obtained search warrant on June 30, 2017, and (b) HCMT and Provident were "acting under the color of law" when Provident participated in the seizure of the cats by trapping them. Madero seeks to hold these defendants liable on the

---

[21]    Gentert has not participated in these proceedings and a default judgment has been entered against her. An examination of her conduct is necessary, however, to consider the claims raised in *respondeat superior* against HCMT.

theory that it was performing a municipal function on behalf of the City of Pittsburgh. Compl. ¶¶ 186-190, 336, 349, 352. The Court finds that HCMT and Provident are not state actors.

As to HCMT and Provident, Madero has not pled that they acted under color of state law according to any of the tests set forth by the Third Circuit. He has done nothing more than allege in a conclusory fashion that HCMT was acting under the color of state law when its volunteers participated in the execution of search warrants to collect cats, and that Provident was a state actor on June 30, 2017, because she was present for the execution of the search warrant. Compl. ¶¶ 145-46, 314-16, 334-35. 347-48. Yet, Provident is not a police or humane officer, and she was certainly not Officer Luffey's law enforcement partner. The Court finds that Madero has failed to plead a threshold color of state law claim.

As to the public function test, Madero has not pled that HCMT's volunteers' or Provident's collection, treatment, and adoption of homeless and abandoned cats was a function that was traditionally the exclusive prerogative of the City. Indeed, the function that they fulfilled cannot be viewed as executing a warrant. Pittsburgh Police officers performed that role. Provident's and the other members of HCMT's role was to help gather and care for the cats that were seized in the encounter. Animals are not like other evidence that can be placed in a police cruiser and stored in an evidence locker without much thought beyond the basics of integrity and preservation. They are living beings that need food, shelter and care. HCMT and its volunteers filled those needs.

Taking care of animals is not a traditional state function. Nor is there any basis for concluding that the services offered by HCMT and its volunteers were ever the exclusive prerogative of the state. No Pennsylvania law requires the City to establish a volunteer animal rescue organization. Moreover, no allegations exist that HCMT or any of its board or individual

members, like Provident, were intertwined with the City. As to the close nexus test, Madero has not pled circumstances that support a close nexus between the City and HCMT volunteers' actions of collecting, treating and adopting homeless and abandoned cats. They were on hand to help after a warrant was executed, no doubt, but their role was collateral to the law-enforcement function served by police officers. Further, Madero does not aver any facts to support a conclusion that the HCMT's conduct in treating and fostering the adoption of cats is dictated or controlled by the City. Madero's Complaint has failed to allege state action under a theory of public function or close nexus.

As to the symbiotic relationship test, Madero has not alleged facts that support a symbiotic relationship between the City and HCMT and its volunteers. This theory is seemingly inapplicable to this case as there is no close association of mutual benefit between the City and HCMT. There is no indication that the HCMT, a non-profit organization, made any profit from caring for cats while police executed a search warrant or receiving cats, and there are no facts pled that the City received any sort of tangible benefit from HCMT. Madero's Complaint has failed to allege state action under a theory of symbiotic relationship.

As to the joint action test, there are no averments in the Complaint that HCMT and Provident had a prearranged plan with the City regarding execution of the search warrant and seizure of the cats. As to the second prong of the test, none of the allegations in the Complaint set forth facts that plausibly suggest any sort of consultation or exchange between law enforcement officers and HCMT and Provident, let alone that these defendants directed the officers how to proceed during the execution of the search warrant and that the officers acted on their command. At most, the Complaint avers that the HCMT volunteers were complicit in the police officers' execution of the warrant. This is not enough to support a claim for joint action.

Much like the HAR Defendants and the defendants in *Chambers*, HCMT is a private non-profit organization engaged in the collection, treatment, and adoption of homeless and abandoned cats. There can be no argument that it was "clothed with any state authority." *See Chambers*, 453 F. Supp. 2d at 872. Just because HCMT might have had an agreement with the City for its volunteers to assist officers in caring for animals while a search warrant was being effectuated does not mean HCMT and its volunteers were acting under the color of state law. *See Groman Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (first aid responders not state actors merely because they responded to assistance from the police); *see also Rendell-Baker* 457 U.S. at 840 (holding that receipt of public funds and the performance of a function serving the public alone are not enough to make a private entity a sate actor).

Neither HCMT nor Provident were required to determine if the search warrants approved by magisterial district judges were legally valid. While Madero contends that no probable cause existed for the search warrant, he has pled no facts imputing that knowledge to HCMT or Provident. The mere presence of Provident and other HCMT volunteers, as private citizens, during the execution of the June 30, 2017 search warrant to assist in the capture and care of the cats until they could be removed from the scene was not a state function.

For these reasons, HCMT and Provident were not acting under the color of state law. Since there can be no violation of constitutional rights without state action, Counts I, II, III, IV and V against HCMT and Counts II, III, IV, and V Provident are dismissed with prejudice.[22]

---

[22] The Complaint pleads that Gentert played a far more expansive role in the alleged violations of Madero's rights. However, as explained above, she has defaulted. Her liability, if any, arising out of Madero's claims under Section 1983 cannot be imputed to HCMT because there is no *respondeat superior* under Section 1983 in this case. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

### 2. Madero's Conspiracy claims may proceed against HCMT.

In Count X, Madero alleges that HCMT and Gentert conspired with Officer Luffey to conduct an illegal search of 5221 ½ and 5223 Lytle Street on June 15, 2017. In Count XIII, Madero alleges that Officer Luffey and HCMT (acting through Gentert) conspired to create the impression that he surrendered the cats on June 30, 2017. As explained above (with regard to the conspiracy claims against Officer Luffey), these counts are related to Madero's claims under Section 1983 and assert that Gentert conspired with Officer Luffey to deprive him of his constitutional rights. For the same reasons set forth above, the Court believes that plausible conspiracy claims have been pled against Gentert and, through *respondeat superior*, HCMT. HCMT's Motion to Dismiss will be denied as to Counts X and XII.

### 3. The state law claims against Provident will be dismissed, as well all state law claims against HCMT (and Gentert).

#### a. HCMT and Provident cannot be liable for conversion or trespass to chattel.

Madero asserts claims (Counts XI and XII) against HCMT, Gentert and Provident for conversion and trespass to chattel. Provident's role was limited to helping officers gather the cats that were to be seized pursuant to a warrant and taking care of those cats until they could be removed from the scene—*i.e.*, the area in and around Madero's property. Gentert did the same (relative to these claims). They were entitled to rely on the warrant and to trust that the police officers were engaged in lawful police behavior. As explained above (as to the HAR Defendants) neither the conversion nor the trespass claims may stand as to Provident or HCMT. Counts XI and XII, as asserted against them, will be dismissed with prejudice.

### b. *The Complaint does not plead tenable claims for fraud or negligent misrepresentation against Gentert or HCMT.*

Madero purports to assert claims (Counts VII and VIII) for fraudulent or negligent misrepresentation against Gentert and, through *respondeat superior*, HCMT. Both claims center around the initial encounter between Madero, Officer Luffey and Gentert on June 15, 2017. In sum, they assert that Officer Luffey made false or misleading statements to Madero about having a warrant and her right to search his residence. The Complaint does not allege a single statement made by Gentert. However, it claims that she had a duty to inform Madero that she was (i) allegedly acting under the color of state law; (ii) that Officer Luffey did not have a search warrant; and (iii) that Officer Luffey did not have the right to break down his door. Compl. ¶¶ 421, 446.

Under Pennsylvania law, fraud requires: (1) a false representation; (2) made with knowledge of its falsity or recklessness as to whether it is true or false; (3) which is intended to make the receiver act; (4) justifiable reliance; and (5) damages to the receiver as the proximate result of the reliance. *See Bucci v. Wachovia Bank, N.A.,* 591 F.Supp.2d 773, 782 (E.D.Pa. 2008). A fraud claim based on an intentional non-disclosure has the same elements of fraud, except that "an omission is actionable as fraud **only where there is an independent duty to disclose the omitted information**." *Id.* at 783 (emphasis added) (quoting *Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 612 (3d. Cir. 1996) ("Pennsylvania Courts have adopted the duty to speak requirement in fraud by omission cases.")).

The "duty to speak" arises only where "one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Id.* (quoting *Chiarella v. U.S.*, 445 U.S. 222, 228 (1980)). "Further, there must be a confidence on the part of one party and a domination and influence on the part of the other, **and**

***both parties must have acknowledged such a fiduciary relationship*.**  *Id.* (emphasis added). This rule applies with equal force to claims for negligent, rather than fraudulent misrepresentation.  *Weisblatt v. Minnesota Mut. Life Ins. Co.*, 4 F.Supp.2d 371, 379 (E.D.Pa. 1998); *State College Area School Dist. V. Royal Bank of Canada*, 825 F.Supp.2d 573, 589-90 (M.D.Pa. 2011) (citing *In re Estate of Evasew*, 584 A.2d 910, 913 (Pa. 1990)).

The Complaint does not plead any fiduciary relationship or other relationship of trust between Gentert and Officer Luffey.  The nature of the encounter and relationship (or lack thereof) between the two does not lend itself to such a finding.  Madero cannot maintain claims for fraud or negligent misrepresentation against either Gentert or HCMT.  Counts VII and VIII, as asserted against HCMT, will be dismissed with prejudice.

### c. *Madero cannot maintain claims for concerted tortious conduct against Gentert and, by extension, HCMT.*

As explained in section B.2.(b), above, regarding claims of concerted tortious conduct against Officer Luffey, concerted tortious conduct, by its very nature, requires action in concert amongst tortfeasors.  In this case, none of Madero's common law tort claims may proceed against any Defendant except Officer Luffey.  There can be no claim, therefore, for concerted tortious conduct.  Counts IX and XIV must be dismissed as to HCMT, as well as Officer Luffey.

## CONCLUSION

AND NOW, this 13th day of February 2020, IT IS HEREBY ORDERED that Officer Luffey's Motion to Dismiss (ECF No. 50) is GRANTED IN PART and DENIED IN PART.  As to Count VII (negligent misrepresentation) and Counts IX and XIV (concerted tortious conduct), the Motion to Dismiss is GRANTED.  These Counts are dismissed with prejudice.  The Motion to Dismiss as to all the other claims against Officer Luffey is DENIED.

IT IS HEREBY ORDERED that the HAR Defendants' Motion to Dismiss (ECF No. 32) is GRANTED. All claims against the HAR Defendants are dismissed with prejudice and the HAR Defendants are dismissed from the case.

HCMT's and Provident's Motion to Dismiss (ECF No. 46) is GRANTED IN PART and DENIED IN PART. The Motion to dismiss is GRANTED with respect to Provident. All claims against Provident are dismissed with prejudice, and she is dismissed from the case. The Motion to dismiss is GRANTED with respect to all claims against HCMT except for Counts X and XII; those claims may proceed. All other claims are dismissed with prejudice.

BY THE COURT:

/s/ *William S. Stickman, IV*
WILLIAM S. STICKMAN, IV
UNITED STATES DISTRICT JUDGE