IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD JAMES MADERO,<br><br>*Plaintiff*,<br><br>v.<br><br>OFFICER CHRISTINE LUFFEY, *et al.*,<br><br>*Defendants*. | Civil Action No. 2:19-cv-700<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Ronald James Madero ("Madero"), is pursuing claims against Defendant, Officer Christine Luffey ("Luffey"), on a variety of federal and state causes of action arising from two separate incidents where Luffey and others under her direction searched his property and, later, seized numerous cats that he claims he owned. Luffey moves for summary judgment on all counts, asserting a variety of legal defenses to Madero's claims. After careful review, the Court holds that the legal defenses asserted by Luffey do not bar Madero's claims and, moreover, that the case presents numerous questions of fact relating to Luffey's conduct and potential liability that a jury must decide. Therefore, Luffey's Motion for Summary Judgment (ECF No. 110) will be denied in part and granted in part. The motion will be granted *only* as to Counts IV-VI, which Madero has abandoned. It will be denied as to all other counts.

I.     FACTUAL BACKGROUND

Madero's claims arise out of the June 15, 2017, search of his property by Luffey and an alleged co-conspirator, Mary Kay Gentert ("Gentert"). They also relate to the June 30, 2017,

1

execution of a warrant that he contends was illegal and the resultant seizure of forty-two cats that he claims to have owned.

Madero resided at 5221 ½ Lytle Street, which was part of a duplex with 5223 Lytle Street, in Pittsburgh, Pennsylvania. Madero's son owns both residences. While Madero claims to have owned the cats that were taken, Luffey takes the position that they were stray or feral and that, as a result, Madero had no legal interest in their possession. Madero points to facts that he contends are indicia of his ownership. For example, he gave names to each of the cats. He provided veterinary care for the cats. He purchased their medicine. He fed and watered the cats twice per day. Indeed, he has produced records that demonstrate that he purchased food and litter for the cats for several years. Madero would call the cats or whistle for them and, he contends, that they responded to the sound of his voice and permitted him to place them in cat carriers in the course of the June 30, 2017, seizure.

On June 15, 2017, Luffey, wearing her full Pittsburgh Police uniform, went to Madero's home, accompanied by Gentert, in response to a complaint relating to a number of cats in and around the residence. Gentert is not a police officer but accompanied Luffey to assist in her investigation. Luffey did not specifically tell Madero that Gentert was assisting her in conducting a police investigation.

There is no dispute that Luffey did not have a search warrant for either portion of the duplex on June 15, 2017. Likewise, Luffey admits that, pursuant to the City of Pittsburgh Police Department's Warrantless Searches and Seizures Policy, she did not have any basis to conduct a warrantless search of the premises on June 15, 2017. Nevertheless, Madero alleges that Luffey told him that she had a warrant and that she did not need his permission to search the premises:

> Q. You testified Luffey told you she had a warrant. Can you remember the language that she used or the words that she used to advise you of that?

> A. Yeah, because she said it, I said: Let me call an attorney. Let me make a phone call to an attorney.
>
> And she stood up, and she says: We don't have to wait for no F-ing attorney. She said: I'll kick the F-ing door in. And then she said it twice.
>
> * * *
>
> And she kind of took—to me, it seemed like she took offense because I wanted to call an attorney. Whether that was the case or not, I don't know, but that's the impression I got.
>
> And then she said: I'm going to kick the F-ing door in. Then at the same time, that's when she said: I'll call back-up, and we'll come and arrest everybody. She said: We can do this the easy way or the hard way, and we'll get everybody and take all the cats and everything.
>
> And then I think that's when Mike said: Bananas, why don't you just show them. And then that's when I took Mary Kay [Gentert] next door and then again at 5221 ½.

(ECF No. 116-2, pp. 76–77). Luffey did not go into the duplex but waited in the car while Gentert searched the premises and took photos. Following the search, Gentert reported what she saw to Luffey and showed her the photos. Luffey admits that she did not complete the warrantless search form required by the policy of the Pittsburgh Police Department. She also admits that she told Madero that if he allowed Gentert inside 5223 Lytle Street and agreed to work with the Homeless Cat Management Team, she would not pursue the matter any further or even write a report. Gentert gave Madero her phone number to permit him to contact her about getting help with the cats. Although he called her multiple times and left voicemails, she never answered or returned his calls.

Based on information obtained by Luffey through Gentert's search, Luffey applied for a search warrant on July 29, 2017. Luffey executed the search warrant on June 30, 2017, accompanied by Gentert and members of the Homeless Cat Management Team. At the time the

3

warrant was being executed, Madero returned home from Animal Friends, where he had taken five cats for medical care. Although the warrant only listed 5223 Lytle Street, Madero contends that Luffey and her companions conducted a search of both 5223 and 5221 ½ Lytle Street, and seized forty-two cats.

Luffey contends that Madero signed a surrender form voluntarily relinquishing his ownership of the cats. Madero vehemently denies that he signed the form. He testified that "I would never surrender any of those cats, nothing, and I never signed anything stating that I would surrender those cats." (ECF No. 116-2, p. 29). Moreover, he stated:

> Q. Okay, have you looked at the signature?
>
> A. It's not my signature.
>
> Q. Does it look like the way you sign your name?
>
> A. No.

(*Id.*). Luffey testified that, while she filled out the form, she did not personally have Madero sign it but rather asked Gentert to obtain the signature. (ECF No. 116-1, p. 30). She admitted that this was the first time in twenty-one years as an officer that she used a civilian to obtain a signed surrender form. She also admitted that she did not witness Madero signing the form and that this was also the first time that she did not witness the signature on a surrender form. It is not disputed that Luffey marked on the form that the cats were "owned" by Madero rather than "stray," which was an option on the pre-printed document. Ultimately, none of the cats were returned to Madero and some were euthanized without his knowledge or consent.

Madero was charged in the Court of Common Pleas of Allegheny County with multiple counts of cruelty to animals, 18 Pa.C.S. § 5511(c). Madero filed an Omnibus Pretrial Motion seeking to suppress the evidence garnered from the search, arguing that Luffey engaged in illegal

4

searches and seizures in the interactions on June 15 and 30. After a hearing on the motion, the Commonwealth and Madero entered into a plea agreement whereby all of the original charges were dropped and Madero pled *nolo contendere* to replacement charges of disorderly conduct. 18 Pa.C.S. § 5503(a)(4). Madero was not required to allocute in connection with his *nolo contendere* plea. Finally, because of his plea, the state court never made findings of fact or ruled on Madero's motion.

## II. STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). But a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

III. ANALYSIS

A. Federal Claims

Luffey's Motion for Summary Judgment on Madero's federal claims[1] relies primarily upon four legal bars to liability. She argues that Madero's 42 U.S.C. § 1983 claims are barred by the doctrines of collateral estoppel, judicial estoppel and the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). Underlying all three arguments is the general contention that Madero cannot maintain his constitutional claims without re-litigating issues already submitted to the state court during his prosecution or otherwise undermining his plea of *nolo contendere* to disorderly conduct. Luffey also argues that, even if these bars do not apply, she is entitled to qualified immunity. The Court holds that these legal doctrines do not foreclose Madero's claims in this action and that his claims against Luffey may proceed to trial.

Luffey also argues that Madero's conspiracy claims should be dismissed because there is insufficient evidence to proceed to a jury regarding "any illicit agreement amongst the parties to engage in and carry out a conspiracy." (ECF No. 113, p. 15). The Court holds, however, that there is a sufficient basis in fact as to the conspiracy claims to submit them to a jury. Thus, Luffey's Motion for Summary Judgment on Madero's federal claims will be denied.

**1) Collateral Estoppel does not apply without an adjudication on the merits.**

Luffey recognizes that Madero's claims relate to violations of the Fourth Amendment and argues that "Plaintiff made these exact Fourth and Fourteenth Amendment arguments in his pretrial suppression motion based on Officer Luffey's June 15th alleged warrantless search and execution of a search warrant on June 30th, as well as a violation of his due process rights."

---

[1] Madero concedes that summary judgment is warranted as to his claims asserting violations of the Fourteenth Amendment (Counts IV-VI). Because he is abandoning those claims, they will be dismissed.

6

(ECF No. 113, pp. 5–6). There is no dispute that Madero raised issues related to the searches and seizures in his suppression motion submitted to the Court of Common Pleas. However, the Court of Common Pleas never decided the issue. As Luffey recognizes, Madero "ultimately pled *nolo contendere* accordingly dropping the factual challenge." (*Id.* at 6). Nevertheless, Luffey contends that collateral estoppel applies because Madero had a "full and fair opportunity to litigate the issues" and suggests that the *nolo contendere* plea constitutes a "final judgment on his claims."

> Collateral estoppel will bar a subsequent claim if:
> 
> (1) the issue decided in the prior litigation was identical to the one presented in the later action;
> (2) there was a final judgment on the merits;
> (3) the party against whom collateral estoppel is asserted [was] a party or in privity with a party to the prior litigation; and
> (4) The party against whom collateral estoppel is being asserted . . . had a full and fair opportunity to litigate the issue in the prior litigation.

*Witkowski v. Welch*, 173 F.3d 192, 199 (3d. Cir. 1999) (citations omitted). Luffey's collateral estoppel argument fails on the second element—there was no final judgment on the merits of Madero's suppression motion.

Even if Madero's argument on the motion to suppress would have required the Court of Common Pleas to determine whether the searches and seizure violated his constitutional rights, his *nolo contendere* plea was entered before that court ever made a decision. Thus, there was no final judgment on the merits concerning the discrete issue of whether the searches and seizures violated the Fourth Amendment. There is no merit to Luffey's contention that Madero's *nolo contendere* plea can be construed as a judgment on the merits *of the Fourth Amendment issue*. None of the elements of the disorderly conduct charge required an admission or determination

that the searches and seizures complied with the Fourth Amendment. That question was never answered. Madero is not precluded from asserting those claims here.

### 2) Judicial Estoppel does not apply.

Similar to her collateral estoppel argument, Luffey contends that the doctrine of judicial estoppel prevents Madero from raising his § 1983 claims. Judicial estoppel precludes litigants from taking a position opposite from one that has previously been successfully taken. The Third Circuit has described the doctrine:

> Judicial estoppel, sometimes called the "doctrine against assertion of inconsistent positions," is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather it is designed to prevent litigants from "playing fast and loose with the courts." The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.

*Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d. Cir. 1996) (quoting *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510, 513 (3d. Cir. 1953)). In the criminal plea context, judicial estoppel will only preclude a party from later challenging issues directly relating to the necessary elements of the charge to which the plea was entered.

The memorandum opinion of the United States District Court for the Eastern District of Pennsylvania in *Jackson v. Mills*, No. CIV. A. 96-CV-3751, 1997 WL 701316, at *1 (E.D. Pa. Nov. 7, 1997), is instructive. There, in a § 1983 claim, the district court rejected an argument that a plaintiff's previous guilty plea to summary disorderly conduct judicially estopped her from arguing that police lacked probable cause to take her into custody and that she should have simply been given a citation. The district court observed that "a misdemeanor disorderly conduct offense involves elements additional to those which constitute a summary disorderly

conduct offense. Plaintiff's guilty plea to the summary offense does not establish probable cause to arrest her for the misdemeanor offense." *Id.* at *2.

Here, Madero's *nolo contendere* plea to summary disorderly conduct does not judicially estop him from taking the position that Luffey's actions in the course of the June 15 and June 30 searches of his property, along with the seizure of the cats, were actionable under § 1983. His *nolo contendere* plea was made without a colloquy on the record. The Court simply cannot find—as necessary for the application of judicial estoppel—that that plea was based on a diametrically opposite position than what Madero takes here. Rather, the claims at issue in this case are far broader with respect to facts and legal issues involved than the narrow issue of whether Madero committed summary disorderly conduct. This is not an instance in which Madero "gain[ed] an advantage by litigation on one theory, and then seek[s] an inconsistent advantage by pursuing an incompatible theory." *Ryan Operations, G.P.*, 8 F.3d at 358. Luffey's judicial estoppel argument fails.

### 3) The *Heck* doctrine does not bar Madero's § 1983 claims.

Luffey next argues that the doctrine enunciated by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Madero's action because he cannot prevail on the claims here without calling into question his conviction for disorderly conduct. In *Heck*, the Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose lawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has

already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed in the absence of some other bar to the suit.

*Id.*, at 486–87. Critical to the Supreme Court's holding was the recognition that the *Heck* bar will only apply when the § 1983 action would "***necessarily*** imply the invalidity of his conviction or sentence." *Id.* at 487 (emphasis added). Illuminating to this case is footnote seven, which discusses the "necessarily" language in a hypothetical example of a § 1983 case asserting Fourth Amendment violations. The note states:

> For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a §1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury.

*Id.* at 487 n.7 (internal citations omitted).

Similar to her arguments on collateral and judicial estoppel, Luffey contends that it is impossible for Madero to proceed, and ultimately prevail, on his § 1983 claims without necessarily undermining his *nolo contendere* plea and resultant summary disorderly conduct conviction. She argues that "[a] finding in Plaintiff's favor would imply the invalidity of his conviction on disorderly conduct which was based upon the evidence found by Officer Luffey during what Plaintiff describes as an unreasonable and unconstitutional search." (ECF No. 113, p. 10). Further, she argues that "if Officer Luffey is found to have acted unlawfully on June 15, then the search warrant that was executed on June 30 would be found to be unconstitutional and the over forty cats that were seized and used as evidence to show that Plaintiff created a

10

hazardous and offensive condition would be suppressed by reason of illegality of the search." (*Id.* at 10–11).

Madero counters that *Heck* does not bar his claims because the animal cruelty charges were dismissed and he pled *nolo contendere* only to summary disorderly conduct, which did not require the evidence garnered in the allegedly illegal searches and seizures. He argues that "*Heck* does not apply where 'the charges for which the plaintiff[s] [were] convicted and the charges which were dismissed aimed to punish separate conduct.'" (ECF No. 114, p. 14) (quoting *Buxton v. Dougherty*, 686 F. App'x 125, 127 (3d. Cir. 2017)). He emphasized that "the charges to which Mr. Madero pleaded *nolo contendere* (disorderly conduct) were separate and distinct from the animal cruelty charges originally brought." (*Id.*). He argues that no determination on the § 1983 claims, in this case, will call into question any element of his *nolo contendere* plea.

*Heck*, by its own terms, is inapplicable. The Supreme Court made absolutely clear that the doctrine would only bar § 1983 claims that would "***necessarily*** imply the invalidity of his conviction or sentence." 512 U.S. at 487 (emphasis added). Footnote seven specifically uses § 1983 claims asserting Fourth Amendment violations as an illustration of the narrowness of the doctrine. There, the Court explained that a § 1983 claim asserting Fourth Amendment violations will not be precluded "*even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction.*" *Id.* at 487 n.7 (emphasis added). In light of the language of footnote seven, the Third Circuit has interpreted *Heck* as, essentially, inapplicable in most § 1983 actions asserting Fourth Amendment claims. *See Sanders v. Downs*, 420 F. App'x 175, 179 (3d. Cir. 2011) ("*Heck* does not typically bar actions for Fourth Amendment violation."); *Clouser v. Johnson*, 40 F. Supp. 3d 425, 434 (M.D.

Pa. 2014) (referring to "the Third Circuit's oft-repeated holding that Fourth Amendment claims are not categorically barred by *Heck*"). Here, Luffey has offered no compelling argument as to why, *in this case*, the *Heck* doctrine should apply, in light of the strong precedent to the contrary. The Court can see no such reason.

Finally, even if the *Heck* doctrine were applied stringently in claims asserting Fourth Amendment violations, it would not preclude Madero's claims here because they do not *necessarily* imply invalidating his *nolo contendere* plea to summary disorderly conduct. That offense is defined as follows:

> (a) **Offense defined**.—A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk there, he: . . .
> (4) Creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a)(4). Madero did not allocute at the time of his plea. However, the record, in this case, is replete with evidence showing that the conditions on the outside of Madero's property, which were in plain sight, were sufficient to support his *nolo contendere* plea to a violation of 18 Pa.C.S. § 5503(a)(4). For example, the Affidavit of Probable Cause submitted by Luffey states that complaints had been raised relating to "sick cats living outside of the residence" and "a mom with kittens under a porch." (ECF No. 112-1, p. 32). The Affidavit further states that upon arrival she saw "2 large dark green tarps hanging from the porch," and "one cat under a van and two cats on the front porch. All three of the cats looked sickly." (*Id.*). She also averred that "the stench of animal waste became stronger as we approached the residence." (*Id.*). Luffey's testimony showed that cats were taken from outside the property, which may readily be characterized as exhibiting a "physically offensive condition." (ECF

12

No. 116-1, p. 46). Thus, the *Heck* doctrine is inapplicable because Madero's Fourth Amendment claims do not necessarily imply the invalidity of his *nolo contendere* plea.

### 4) Luffey is not entitled to qualified immunity.

Luffey raised the defense of qualified immunity in her Motion to Dismiss, which the Court rejected in its February 13, 2020, Opinion. She raises it again here, premising her argument on two points—(1) that Madero has not shown that Luffey violated any constitutional right because doing so would require the invalidation of his *nolo contendere* plea; and (2) "the seizure of the feral animals is not an issue that a police officer would be on notice of in June of 2017 regarding the violation of someone's property rights . . . there is no caselaw that indicates a police officer cannot take or seize feral cats from someone [who] is hoarding them." (ECF No. 113, p. 19). The Court will, again, reject Luffey's invocation of qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). In examining a claim for qualified immunity, district courts may employ the test enunciated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001). *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (The *Saucier* test is "often appropriate," but "should no longer be regarded as mandatory"). Under the *Saucier* analysis, a court must first determine whether a plaintiff has alleged the violation of a constitutional right. *Pearson*, 555 U.S. at 232. If the plaintiff satisfied the first step, a court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

13

Here, Madero asserted that Luffey violated his Fourth Amendment rights by actions relating to the June 15 and June 30 searches of his property and the seizure of the cats on June 30. Madero has adduced enough evidence to proceed to a jury on those claims. He has unquestionably pled, and offered evidence in support of, a violation of a clearly established constitutional right that a reasonable person would have known about.

Luffey appears to argue that Madero cannot assert a constitutional violation because of his *nolo contendere* plea and, as such, he has failed to establish the first prong of the *Saucier* test. This argument has already been thoroughly addressed above, and rejected, in connection with Luffey's collateral estoppel, judicial estoppel and *Heck* doctrine arguments. There is no question that Madero has asserted a cognizable violation of his rights under the Fourth Amendment and, indeed, supported that claim with sufficient evidence to proceed to a jury. The first prong of the *Saucier* test has been satisfied.

Luffey also argues, as to the second prong of the *Saucier* test, that Madero's rights were not clearly established. She contends that "there was no law in June 2017 that would put Officer Luffey on notice that feral cats were someone's property and could not be seized." (ECF No. 113, p. 19). This argument is inconsistent with both the law and the facts adduced in this case.

It is important to note that Madero's Fourth Amendment claims assert both an illegal search and an illegal seizure. There is no question that the right of a citizen to be free from illegal searches is well established. Madero has pled and asserted evidence that on June 15, 2017, Luffey lied to him about having a warrant to obtain coerced consent to a search of his property,[2] that the search was undertaken through Gentert, an intermediary and co-conspirator, and that evidence adduced in that search was used to obtain the warrant executed for the June 30, 2017, search and seizure. There is nothing novel or unsettled about the controlling law governing this part of Madero's claims. Indeed, the record adduced in this case shows that Luffey was well aware of her obligations under the Fourth Amendment. She testified that she is familiar with Pittsburgh Bureau of Police Order No. 45-2, which is a policy governing warrantless searches. (ECF No. 116-1, p. 40). Further, there is evidence that in 2013 Luffey was required to be re-trained "in regards to Search & Seizure." (ECF No. 116-10, pp. 2–5). This training covered "all aspects of Order No. 42-2." (*Id.* at 3). It addressed, *inter alia*, "[w]arrantless seizure of animals, **consent searches of residences for animal living conditions**, and consent to present an animal for inspection were covered . . . ." (*Id.*) (emphasis added). "Luffey was very receptive to the training, took several notes, and displayed a working

---

[2] Madero testified about the June 15 interaction:

> Q. You testified Luffey told you she had a warrant. Can you remember the language that she used or the words that she used to advise you of that?
>
> A. Yeah, because when she said she had it, I said: Let me call an attorney. Let me make a phone call to an attorney. And she stood up, and she says: We don't have to wait for no F-ing attorney. She said: I'll kick the F-ing door in. And then she said it twice.

(ECF No. 116-2, p. 17).

15

understanding of the material." (*Id.*). Luffey cannot reasonably argue that her obligations under the Fourth Amendment were unclear at the time of the June 15 and June 30 searches.

Nor can Luffey reasonably contend that the law was unclear as to whether a police officer can "take or seize feral cats from someone who is hoarding them." (ECF No. 113, p. 19). Whether Madero owned some or all of the cats that were seized loomed large in the Court's analysis of the Motion to Dismiss. At that procedural juncture, Madero claimed to own the cats and Luffey argued that they were merely strays or feral and that he could not assert a property right in them that would support a claim that they were illegally seized. The Court's Opinion set forth some considerations that could be weighed to determine whether Madero actually owned the cats. Since that time, a record has been developed to add context to the facts pled that not only supports a finding that Madero owned the cats, but that *Luffey recognized that he did* before, during and after the June 30 seizure.

In Luffey's deposition, she testified: "I asked him if he would surrender *ownership* of the cats. He told me yes. He told me he didn't want them anymore." (ECF No. 116-1, p. 28) (emphasis added). She further testified: "I said, do you understand once you surrender ownership, that you won't be getting them back?" (*Id.* at 29). She then explained that Madero was presented with a form that he allegedly signed surrendering the cats.[3] She explained that

---

[3] Madero disputes that he actually signed the form. After a review of the record, the Court finds that Madero has adduced enough evidence to constitute a genuine issue of material fact as to whether he actually signed the document or whether his signature was forged, as he contends. Madero testified, for example, that "I would never surrender any of those cats, nothing, and I never signed anything stating that I would surrender those cats." (ECF No. 116-2, p. 29). He unequivocally testified that "[i]t's not my signature" when shown the form. (*Id.*). Luffey's testimony confirms that, at the very least, there was some irregularity as to the execution of the surrender form. She testified that she gave the form to Gentert to present to Madero and obtain his signature. It is the only time in her time as a police officer (over twenty-four years) that she had a civilian obtain a signature on a surrender form. (ECF No. 116-1, p. 51). She also conceded that it was the only time a surrender form was obtained outside her presence. (*Id.*).

"[a]t some point Ms. Gentert handed me a completed surrender form. I realized that I still needed to speak with Mr. Madero. I remember we had a full sheet of paper, that's a receipt, an inventory receipt of the 37 cats that we were taking from 5223 Lytle Street." (*Id.* at 30). The form itself entitled a "Special Incident Form"—which Luffey testified that she completed—has an option for both "stray" and "owned" animals. It was filled out to indicate that the cats were "owned by Ronald Madero." (ECF No. 1-21).

For qualified immunity to apply, Madero's rights *at the time of the incident* had to have been unclear to Luffey. She now argues that it was unclear on June 30, 2017, that she could not seize "feral" or "stray" cats. But both the paperwork from that time and Luffey's subsequent testimony show that she did not consider that the cats were, in fact, stray or feral. Rather, she believed that they were owned by Madero, explained to him the legal consequences of surrender and allegedly presented him with a surrender form to relinquish ownership of the cats. Luffey believed that Madero owned the cats. As explained above, not only was the Fourth Amendment's scope and extent with regard to the seizure of personal property clear at the time of the June 30 incident, but Luffey had been specifically trained in how that law applies to animal-related situations. There is no basis for her invocation of qualified immunity.

### 5) There are genuine issues of material fact as to whether Luffey engaged in a conspiracy.

Luffey argues that Madero has failed to show enough evidence supporting his conspiracy claim to allow it to proceed to a jury. She contends that "Plaintiff cannot provide any evidence of any illicit agreement amongst the parties to engage in and carry out a conspiracy. Plaintiff can

---

This is pertinent to Luffey's invocation of qualified immunity because the mere presence of the surrender form cannot be the basis of a finding, at this stage, that the rights in the cats were voluntarily relinquished.

only rely on conclusory allegations from his Complaint which are insufficient to survive a motion for summary judgment." (ECF No. 113, p. 15). The Court disagrees.

The Third Circuit has held that "direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances." *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184–85 (3d. Cir. 2009) (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). Madero has adduced sufficient circumstantial evidence to create a genuine issue of material fact as to whether Luffey conspired with Gentert to deprive him of his constitutional rights. Indeed, the record includes substantial evidence of Luffey's cooperation with Gentert before, during and after both the June 15 and June 30 searches. Indeed, it was Gentert who actually conducted the search of the premises on June 15. She was actively involved in providing information that Luffey used to obtain a warrant and was involved in the execution of the warrant on June 30. Moreover, Luffey testified that she filled out the surrender form and provided it to Gentert to have executed by Madero on June 30. There is more than enough evidence to show that Luffey's and Gentert's interaction during the times at issue, in this case, was neither incidental nor casual, but that they were working in concert toward a common end—an end that Madero alleges violated his rights under the Fourth Amendment. There is more than enough evidence to submit to a jury to determine whether there was a conspiracy under § 1983.

**B. Luffey is not immune from Madero's state law claims.**

Luffey argues that summary judgment is warranted on Count VII (fraudulent inducement/misrepresentation) and Count XII (trespass to chattel) because she is immune under

18

the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S. § 8541.[4] Madero contends that this issue has already been addressed by the Court at the motion to dismiss stage and that Luffey is not immune from intentional torts. (ECF No. 114, p. 25). Luffey replies that pursuant to the Pennsylvania Supreme Court's decision in *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994), a police officer is immune under the PSTCA, even from claims involving intentional torts, unless the plaintiff can assert "willful misconduct" on the part of the officer. She contends that "Madero must demonstrate that there is a material issue of fact as to whether Officer Luffey's actions constituted 'willful misconduct' for both the Count VII fraudulent inducement/fraudulent misrepresentation claim and Count XII trespass to chattel claim. Madero has not done so . . . ." (ECF No. 117, p. 13). The Court disagrees.

There is more than enough evidence to create genuine issues of fact as to whether Luffey engaged not only in intentional conduct, but in willful misconduct in relation to the claims alleged at Counts VII and XII. At Count VII, Madero alleges that Luffey lied to him about having a warrant and used false representations and threats to obtain entry into his residence on June 15, 2017. He unequivocally testified that Luffey represented that she had a warrant, that she was entitled to search his property and that "[w]e don't have to wait for no F-ing attorney . . . . I'll kick the F-ing door in." (ECF No. 116-2, p. 17). There is no question that Luffey did not have a warrant on June 15. To the extent that Madero's testimony is true—which Luffey disputes—a reasonable jury could find that Luffey engaged in willful misconduct, specifically, a willful misrepresentation of whether she had a warrant and right to search his premises. Likewise, Count XII alleges that Luffey committed a trespass to Madero's cats when she seized them pursuant to a warrant obtained by unlawful means and engineered an involuntary surrender

---

[4] Luffey concedes that Count XI (conversion) "arguably fits within exception 8542(b)(2) of the PSTCA."

of his rights in the cats. As explained above, there is evidence that could lead a reasonable jury to agree with Madero's allegations. By way of example, there is a material dispute of fact as to whether Madero's signature was forged on the surrender form. A reasonable jury could determine that Luffey's conduct with respect to the allegations underlying Count XII constituted willful misconduct.

Because there are genuine issues of material fact as to whether Luffey's actions with respect to Counts VII and XII constituted willful misconduct, the Court cannot hold that she is shielded by immunity pursuant to the PSTCA. Thus, her Motion for Summary Judgment on Counts VII and XII is denied.

### IV. CONCLUSION

The Court finds that none of Luffey's legal arguments apply and that several genuine issues of material fact remain. As such, the Court denies Luffey's Motion for Summary Judgment (ECF No. 110) with the exception of Counts IV-VI, which Madero abandoned. An Order of Court will follow.

July 14, 2021

BY THE COURT:

*/s/ William S. Stickman IV*

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE